UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

EWART BURTON,

                Plaintiff,

  -against-

UNDERCOVER OFFICER #155 and POLICE
OFFICER BILLY CHOI,

                Defendants.

**SECOND AMENDED
COMPLAINT &
JURY DEMAND**

**CASE NO:** 14-CV-7158
(WFK) (RER)

Plaintiff Ewart Burton, by and through his attorneys Emery Celli Brinckerhoff & Abady LLP, as and for his Complaint alleges as follows:

### NATURE OF THE ACTION

1. For nearly a decade, officers in NYPD's Brooklyn South Vice Squad targeted Ewart Burton and Temptations Tavern ("the Tavern"), a West Indian bar and dance club Mr. Burton managed in the East Flatbush neighborhood of Brooklyn. The Vice Squad had one goal: get the Tavern shut down and out of the neighborhood. By falsely claiming that Mr. Burton participated in violations of liquor laws, these officers, including Defendants Undercover Officer #155 and Billy Choi, ultimately succeeded in their goal. This case stems from the false statements these officers made about Mr. Burton and the Tavern that served as the basis for a meritless criminal prosecution and that were made for the real purpose of driving the Tavern out of business.

2. On March 5, 2011, the Vice Squad dispatched undercover officers to the Tavern. Undercover Officer # 155 falsely claimed that he purchased several alcoholic beverages after 4 a.m. from a Tavern bartender, in violation of New York Alcoholic Beverage Control laws ("ABC laws"). He made this claim despite not recovering or preserving a single drink from these

1

alleged sales and not recovering any prerecorded buy money allegedly used to make these purchases. This officer could not preserve this evidence because it did not in fact exist. Despite the fact that Mr. Burton was not involved in this or any other illegal conduct that night, Officer Billy Choi arrested him, and he was charged with violating ABC laws.

3. These false statements then served as the basis for a criminal prosecution against Mr. Burton and the Tavern bartender. For over two and half years, these charges loomed over Mr. Burton. He was forced to show up to Brooklyn Criminal Court numerous times after the case was repeatedly delayed, and the People went through five different Assistant District Attorneys before ultimately going to trial. After no credible evidence of illegal conduct emerged, the trial judge quickly found Mr. Burton and the bartender not guilty of all charges. Before the court reached this decision, however, the Vice Squad was successful in achieving its true goal. Relying, in part, on the baseless allegations of illegal alcohol sales on March 5th, the New York State Liquor Authority cancelled the Tavern's liquor license. The Tavern was forced to close, and Mr. Burton lost his livelihood.

## PARTIES

4. Plaintiff Ewart Burton resides in Kings County, New York. At all times relevant to this action, he was the general manager of Temptations Tavern. In this role, he was responsible for making sure the establishment was clean and well-stocked, employees arrived on time and were ready to work, and all licenses were up to date, among other things. At all times relevant to this action, he held no ownership interest in the corporation that operated the Tavern—Sherwyn Toppin Marketing Consultants, Inc. ("Sherwin Toppin"). This corporation is owned by Merl Burton, Mr. Burton's wife, who was also the licensee on the Tavern's liquor license.

5. Defendant Undercover Officer #155 was at all times relevant an officer employed by the New York City Police Department ("NYPD") assigned to Brooklyn South Vice Enforcement Squad. He is named here in his individual capacity.

6. Defendant Billy Choi was at all times relevant an officer employed by the NYPD and assigned to the Brooklyn South Vice Enforcement Squad. He is named here in his individual capacity.

## JURISDICTION AND VENUE

7. This Court has original subject matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because Plaintiff's claims arise under a law of the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation, under color of State law, of rights guaranteed by the Constitution of the United States.

8. Venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiff's claims arose in this judicial district.

## JURY DEMAND

9. Plaintiff demands trial by jury in this action.

## FACTS

10. The Tavern was located at 2210 Church Avenue in the East Flatbush neighborhood of Brooklyn. It first opened in 2004 and catered primarily to a West Indian clientele. It included a dance floor, several bars, and a small office. The Tavern employed security guards, bartenders, bar backs, DJs, waitresses, and managers.

11. The Tavern was a well-known and highly successful neighborhood establishment. On most weekend nights, it attracted over 300 patrons. But, as described below, that all came to

an end because of NYPD's Brooklyn Vice Squad and its officers, Defendants Choi and Undercover Officer #155.

*Safety & Security Standards in Place at Temptations Tavern*

12. The Tavern and Mr. Burton employed strict security measures not only to ensure the safety of patrons and staff, but also to ensure that the establishment complied with all applicable ABC laws.

13. The Tavern employed approximately twenty-two licensed security guards and relied on over twenty surveillance cameras covering the bar, dance floor, office, entranceways and staircases. All patrons entering were required to show identification, which security guards scanned before permitting entry. The identification scanner was used to deny entry to anyone under the age of twenty-one or anyone previously banned from entering the bar. All patrons then went through a body scanner and were searched. Anyone carrying a gun, other prohibited weapon, drugs, or outside alcohol was prohibited entry and permanently banned from the establishment. Patrons were then searched a second time after entering.

14. The Tavern also put in place strict measures to ensure that alcohol was not served after 4:00 a.m. The DJ would notify patrons by 3:45 a.m. that it was the last call to purchase alcohol and that the bar stopped serving drinks at 4:00 a.m. The DJ would make this announcement several times before the bar ultimately closed. At this point, all sales of alcoholic and non-alcoholic beverages would cease.

15. Mr. Burton instructed all employees, including bar staff and other managers, to strictly follow these rules.

16. These policies were also prominently displayed on the walls of the bar with various signs including the following language: "the bar closes at 4:00 a.m."; "No drinking after 4:30 a.m."; and "last call is at 3:45 a.m."

17. Despite establishing these policies, the bar was a constant target of NYPD's Vice Squad.

***NYPD's History of Targeting Burton & Temptations Tavern***

18. Starting in at least May 2005, the Vice Squad began relentlessly going after Mr. Burton and the Tavern in a concerted effort to close down the establishment. Indeed, as Officer Choi admitted in his testimony, "Temptations Nightclub was on the commanding officer's [of the Vice Squad] priority list."

19. NYPD officers showed up on a near monthly basis for six years to conduct unannounced "inspections" of the bar. The police frequently showed up after 4 a.m. to check whether bartenders were still selling drinks.

20. Mr. Burton and other Tavern employees received nearly 100 baseless summonses for allegedly illegal conduct occurring at the bar. On one occasion, in approximately 2011, Mr. Burton even received a summons for disorderly premises on a date he was not at the Tavern. This incident, and the nearly 100 others, were dismissed for legal insufficiency or otherwise resolved in Mr. Burton's or his employees' favor.

21. Mr. Burton was arrested at least ten times for illegal conduct supposedly occurring at the Tavern. None of these arrests resulted in convictions against him.

22. The City also brought six nuisance abatement actions against the Tavern in an effort to shut it down. These actions were all without a single complaint from the public that the Tavern was a nuisance. Again, nearly all were dismissed by stipulation between the parties.

23. In 2008, Mr. Burton and Sherwyn Toppin brought a lawsuit against the City and its officers to put an end to the harassment. While that suit was pending, NYPD officers continued targeting the Tavern and Mr. Burton, including on March 5, 2011.

***March 5, 2011 Incident***

24. At approximately 11:00 p.m. on March 5, 2011, the Tavern's bar staff arrived to begin its set up an hour before the club opened. After opening at midnight, the bartenders served beer, wine, and liquor from 12:00 a.m. to 4:00 a.m., as permitted and as was the bar's custom. Whitney Perkins was one of the bartenders serving during those hours that night.

25. Around 3:45 am, the DJ made an announcement that the bar was closing at 4. The DJ repeated this announcement several times before the bar ultimately closed. The bartenders, including Ms. Perkins, stopped selling alcohol at 4:00 a.m. She left her post behind the bar and joined one of her friends on the dance floor.

26. Mr. Burton, who spent that night going around the club to make sure all was in order, did not sell any alcohol during the prohibited hours either. He also did not observe any bartenders doing so, and he did not encourage or authorize anyone to do so. Mr. Burton was well aware that the police frequently showed up at his bar in an effort to catch the bar in violation of ABC laws and made clear to his employees that violating ABC laws put the whole bar at risk. He knew that the consequences of not following these laws were too great.

27. Even though no unlawful drinks were sold, Undercover Officer #155 claimed that he arrived at the Tavern, posing as a patron, and purchased multiple drinks from Ms. Perkins after 4:00 am. He claimed to use prerecorded buy money to make these purchases.

28. Between 5:00 and 6:00 a.m., Officer Billy Choi and several Vice Squad officers descended on the Tavern, after Undercover Officer #155 claimed to have caught Ms. Perkins

making these illegal sales. The officers arrived wearing marked NYPD jackets and began inspecting the premises, looking for other alleged illegal activity and looking for Ms. Perkins.

29.     Officer Choi claimed that after he and the other officers arrived, Mr. Burton locked the door to the office and refused to unlock it, preventing them from inspecting the area. Mr. Burton engaged in no such behavior.

30.     Undercover Officer #155 also claimed that Ms. Perkins sold him another alcoholic beverage at 6:15 a.m., at least fifteen minutes after these marked police officers arrived. He again maintained he used pre-recorded buy money for the purchase.

31.     The officers eventually located Ms. Perkins on the dance floor and arrested her about forty minutes after their arrival.

32.     Mr. Burton was also arrested. Officer Choi placed Mr. Burton in handcuffs and walked him out of the bar to an NYPD van, as patrons and Tavern employees looked on. While Mr. Burton was under arrest, an unidentified female officer told Mr. Burton that the City was going to "shut down Temptations Tavern permanently." He was then taken to central booking and jailed for hours before eventually being released.

### *Baseless Criminal Prosecution Moves Forward*

33.     Even though he did not participate in any illegal sale of alcohol, did not own the establishment, and was not on the liquor license, Mr. Burton was charged on March 5, 2011, with several violations of ABC laws. He was charged with after-hours sale of alcohol, an off-hour/day sales violation, failure to allow inspection, and violation of the ABC law. He was also charged with Obstruction of Governmental Administration in the second degree, a charge that was later dropped.

34. The charging document against Mr. Burton was sworn to by Officer Choi and was based on Undercover Officer #155's account of events. It incorrectly listed Mr. Burton as the owner of the Tavern.

35. Ms. Perkins was likewise charged with after-hours sale of alcohol.

36. Not only did the officers charge Mr. Burton, but the incident was used as the basis for a separate administrative proceeding. On March 17, 2011, less than two weeks after Mr. Burton's baseless arrest and charges, New York State Liquor Authority ("SLA") brought an enforcement action to cancel the Tavern's liquor license based on alleged violations of ABC laws.

37. For the next two and half years, Mr. Burton was compelled to be present approximately fifteen times for court appearances stemming from these baseless criminal charges. His case was continued numerous times, and the Brooklyn District Attorney's Office went through five different prosecutors before the case ultimately went to a bench trial beginning on October 15, 2013 before Judge Green in Kings County Criminal Court.

38. At trial, both Officer Choi and Undercover Officer #155 testified. Undercover Officer #155 again claimed that Ms. Perkins made multiple sales of alcohol to him after 4:00 a.m., including even after Officer Choi and other officers arrived on scene. And, Officer Choi again falsely claimed that Mr. Burton prevented officers who arrived on the scene from entering the Tavern's office.

39. The accounts of these officers were not corroborated by other evidence and were indeed mostly contradicted. Surveillance footage from this incident from after the police arrived show that no sales of alcohol occurred and do not show Mr. Burton preventing officers from inspecting the Tavern. Undercover Officer #155's testimony regarding the timing of these

8

purchases contradicted an affidavit he signed about the incident and that was used in a separate civil proceeding. And, both Ms. Perkins and Mr. Burton refuted that these sales or other illegal conduct occurred.

40. The officers also did not present any physical evidence or photographs of the purportedly sold alcohol. None of the alleged prerecorded buy money Undercover Officer #155 allegedly used to buy these drinks was recovered.

41. These officers also presented no credible evidence that Mr. Burton knew about or encouraged any illegal sales or that he was the owner or liquor licensee of this establishment.

42. On December 4, 2013, at the conclusion of the bench trial, Judge Green found both Mr. Burton and Ms. Perkins not guilty of all charges.

43. In addition to Judge Green, another court—Judge Velasquez in Kings County Supreme Court—found these officers' accounts of this incident baseless. On April 4, 2011, as part of a nuisance abatement action the City brought against the Tavern, Judge Velasquez found that the officers gave inconsistent testimony about what occurred on March 5th and did not offer any admissible evidence to corroborate their accounts. He found that Undercover Officer #155's testimony, in particular, completely lacked credibility.

44. Although these courts found the Officers' account of March 5th unfounded, it was not enough to save the Tavern. On November 2, 2011, the SLA, relying on the March 5th incident, cancelled the Tavern's license. And the next day, the Tavern officially closed its doors.

45. Because of these unfounded charges originating from Defendants, Mr. Burton suffered extensively. He lost his job and the establishment he helped build up for nearly a decade. The financial strain of having no employment caused his home to go into foreclosure and resulted in extensive strain on his marriage. And, he suffered both personal and professional

9

embarrassment arising from the arrest and unfounded charges pending against him for over two years.

## FIRST CAUSE OF ACTION
## 42 U.S.C. § 1983/Malicious Prosecution

46. Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

47. Officer Choi and Undercover Officer #155 initiated, or caused the initiation of, criminal proceedings against Plaintiff for violations of ABC laws.

48. Defendants knew that they lacked probable cause to initiate criminal proceedings against Plaintiff for violations of ABC laws.

49. Defendants acted with actual malice, as demonstrated by, *inter alia*, their decision to pursue this proceeding despite lacking probable cause and their continued harassment of Plaintiff and his place of employment.

50. By initiating these baseless proceedings, Officer Choi and Undercover Officer #155 compelled Plaintiff to appear in court approximately fifteen times over a two-year period in connection with these criminal proceedings.

51. The prosecution ultimately terminated in Plaintiff's favor when he was found not guilty of the charges on December 4, 2013.

52. The acts and conduct of Defendants constitute malicious prosecution in violation of the Fourth Amendment to the United States Constitution.

53. Upon information and belief, Defendants knew of each other's wrongful acts and displayed deliberate indifference to Plaintiff's constitutional rights by failing to rectify each other's wrongful acts.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983/Abuse of Process

54. Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

55. Officer Choi and Undercover Officer #155 initiated, or caused the initiation of, criminal proceedings against Plaintiff for violations of ABC laws.

56. Defendants knew that they lacked probable cause to initiate criminal proceedings against Plaintiff for violations of ABC laws.

57. By initiating these baseless proceedings, Defendants compelled Plaintiff to appear in court approximately fifteen times over a two-year period in connection with these criminal proceedings.

58. Defendants intended to harm Plaintiff's place of employment without justification.

59. Defendants employed this baseless legal process for the improper and collateral purpose of using it to assist in an enforcement action by the State Liquor Authority to revoke the Tavern's liquor license.

60. The acts and conduct of Defendants constitute abuse of process in violation of the Fourth Amendment to the United States Constitution.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

a. compensatory damages in an amount to be determined at trial;

b. punitive damages;

c. reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

d. such other and further relief as this Court may deem just and proper.

Dated: February 10, 2017
New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP

By: _____
Earl S. Ward
Jessica Clarke

600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiff*